**Alfred COLEMAN and Edward J. McClennan, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 20227.**

United States Court of Appeals Ninth Circuit.

June 21, 1966.

George W. Nilsson, Los Angeles, Cal., for appellants.

Edwin L. Weisl, Jr., Asst. Atty. Gen., Roger P. Marquis, George R. Hyde, Attys., Dept. of Justice, Washington, D. C., Manuel L. Real, U. S. Atty., Ern-

estine Tolin, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before CHAMBERS and JERTBERG, Circuit Judges, and THOMPSON, District Judge.

THOMPSON, District Judge:

Appellant has brought the case here to review the order of the District Court granting summary judgment to Appellee and dismissing Appellant's counterclaim. As originally filed by the United States, the suit was for ejectment of Coleman from his mining claims in the San Bernardino National Forest. The claims had been contested by the United States at the instance of the Forest Service in proceedings before the Interior Department and found invalid. In the District Court, Appellant counterclaimed, seeking judicial review of the decision of the Interior Department under the Administrative Procedure Act, 5 U.S.C. § 1001 et seq. The initial problem here is the appropriateness of Appellant's counterclaim as a vehicle to obtain judicial review.

■ We think it settled, at least in this Circuit, that although the Administrative Procedure Act does not permit a trial *de novo* of administrative decisions, Noren v. Beck, 199 F.Supp. 708 (D.C. S.D.Cal.1961); Adams v. United States, 318 F.2d 861 (9 CCA 1963), it does authorize and require judicial review under the standards of the Administrative Procedure Act, Adams v. Witmer, 271 F.2d 29 (9 CCA 1959), Denison v. Udall, 248 F.Supp. 942 (D.C.Ariz.1965), and that a counterclaim is a permissible method of obtaining such review. Adams v. United States, supra.

■ The District Judge rendered judgment for the United States on its complaint and dismissed Appellant's counterclaim, but he did so only after "having considered the files, records and evidence in the case, including the entire certified record of the administrative proceedings." (Tr. 224) In view of this statement, we deem the dismissal of the counterclaim as an affirmance of the decision of the Interior Department on the merits and not as a dismissal because of some procedural deficiency. This is so because the decision invalidating the mining claims is the sole foundation for the ejectment action.

The eighteen mining claims in question were located as building stone claims (30 U.S.C. § 161)[1] on the dry bed of Baldwin Lake and an adjoining mountain within the San Bernardino National Forest during the period of 1949 to 1952. The claims cover an area of 720 acres. An application for patent was filed by Coleman in January, 1956, and a contest was commenced at the instance of the Forest Service on February 24, 1958, the charges being that:

"(a) The lands embraced within the claims are non-mineral in character.

"(b) Minerals have not been found within the limits of the claims in sufficient quantities to constitute a valid discovery.

"(c) $500.00 has not been expended on Baldwin Lake Quarry Claims No. 7, 9, 11 to 19, inclusive."

The Hearing Examiner, on December 18, 1958, found five of the mining claims to be valid and the other thirteen to be invalid. On appeal, the Acting Director of the Bureau of Land Management, on June 22, 1960, sustained the validity of three claims and part of a fourth. The Secretary of the Interior, acting through his Deputy Solicitor, in considering the appeal taken by Mr. Coleman, reviewed in detail the evidence introduced at the hearing on the contests. The Deputy Solicitor rendered a decision declaring all the subject mining claims to be null and void

---

1. "§ 161. Any person authorized to enter lands under the mining laws of the United States may enter lands that are chiefly valuable for building stone under the provisions of the law in relation to placer mineral claims. Lands reserved for the benefit of the public schools or donated to any States shall not be subject to entry under this section. Nothing contained in this section shall be construed to repeal section 471 of Title 16 relating to the establishment of national forests."

for the reason that a valid discovery had not been made. United States v. Alfred Coleman, A–28557, March 27, 1962. The ejectment action was filed August 8, 1963.

At the outset, we are faced with contentions by the Government seeking to limit the scope of judicial review of decisions in the Department of the Interior. This campaign commenced some years back when first it was broadly contended that the Administrative Procedure Act does not apply to Decisions of the Secretary of the Interior. This Court had no difficulty in rejecting this contention. Adams v. Witmer (9 CCA 1958), 271 F.2d 29. Cf. Wong Yang Sung v. McGrath, 1950, 339 U.S. 33, 70 S.Ct. 445, 93 L.Ed. 616. Next, as in this case, the Secretary has argued that the determination of a question of fact by the "Secretary of Interior, or his authorized representative, is conclusive in the absence of fraud or imposition" and that "decisions of the Secretary of Interior with respect to public lands have historically been accorded a conclusiveness beyond that of typical regulatory agencies." These are not the standards for review provided in the Administrative Procedure Act adopted in 1946 [5 U.S.C. § 1009(e)]. The Government supports the limited review of actions by the Secretary of the Interior with the footnoted excerpts from the following cases: Cameron v. United States, 1920, 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659;[2] Standard Oil Co. of California v. United States (9 CCA 1940), 107 F.2d 402, 410;[3] and Best v. Hum-

2. Cameron v. United States, 252 U.S. 450, at page 459, 40 S.Ct. 410, at page 412:

"By general statutory provisions the execution of the laws regulating the acquisition of rights in the public lands and the general care of these lands is confided to the Land Department, as a special tribunal; and the Secretary of the Interior, as the head of the department, is charged with seeing that this authority is rightly exercised to the end that valid claims may be recognized, invalid ones eliminated, and the rights of the public preserved. (Citations omitted.)

"A mining location which has not gone to patent is of no higher quality and no more immune from attack and investigation than are unpatented claims under the homestead and kindred laws. If valid, it gives to the claimant certain exclusive possessory rights, and so do homestead and desert claims. But no right arises from an invalid claim of any kind. All must conform to the law under which they are initiated; otherwise they work an unlawful private appropriation in derogation of the rights of the public.

"Of course, the land department has no power to strike down any claim arbitrarily, but so long as the legal title remains in the Government it does have power, after proper notice and upon adequate hearing to determine whether the claim is valid, and, if it be found invalid, to declare it null and void."

Cameron v. United States, 252 U.S. 450 at p. 464, 40 S.Ct. 410, at page 414:

"Whether the tract covered by Cameron's location was mineral and whether there had been the requisite discovery were questions of fact, the decision of which by the Secretary of the Interior was conclusive in the absence of fraud or imposition, * * * [Citations omitted.] Accepting the Secretary's findings that the tract was not mineral and that there had been no discovery, it is plain that the location was invalid, as was declared by the Secretary and held by the courts below."

3. Standard Oil Co. of California v. United States, 107 F.2d 402, at p. 409:

"The disposal of the public lands is not a subject over which the 'judicial power' of the United States is extended. It is a field in which the authority of the Congress is supreme. Lee v. Johnson, 116 U.S. 48, 6 S.Ct. 249, 29 L.Ed. 570; Art. IV, sec. 3, clause 2, of the Constitution, U.S.C.A. Where Congress grants public lands to a state, reserving those known to be mineral as of the approval of the survey, it is thought that there is no constitutional impediment to its delegating to any instumentality it may select the authority of determining, as a fact, what lands fall within the excluded class. Compare Shields v. Utah & Idaho R. Co., 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. 111. The state or its transferees obviously have no constitutional right to demand the property on terms differing from those imposed. Their claim to the land does not derive from the Constitution. Nor is the power of Congress, under the broad authorization of that document, so limited as to require the fact-finding agency to make its de-

boldt Mining Company, 1963, 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350.[4]

Our study of these decisions and others has not persuaded us that Congress intended decisions of the Department of the Interior which reject applications for patents to enjoy a more favored position than those of other executive agencies under the Administrative Procedure Act. The *Cameron* case was decided in 1920, some twenty-six years before the Congress had spoken with respect to the scope and standards of judicial review of administrative rulings. Similarly, the *Standard Oil* case in this Circuit was decided six years before the adoption of the Administrative Procedure Act. Nor do we find in the *Best* case any support for the Government's present contentions. True, in that opinion Justice Douglas complimented the work of former Justice Van Devanter and quoted extensively from his opinion in *Cameron*. But the issue decided in *Best* was whether the Government could contest a mining claim administratively during the pendency of a condemnation action, and the Court explicitly, in Fn. 7 (371 U.S. 338, 83 S.Ct. 383), alluded to the present procedures: "Claimants *today* may appeal the Examiner's decision to the Director of the Bureau (43 CFR, 1962 Supp. § 221.1), from him to the Secretary (id., § 221.31), and from there to the courts. Foster v. Seaton, 106 U.S.App.D.C. 253, 271 F.2d 836." Also, in *Best*, the Court significantly refrained from commenting on the claimed onerousness of hearings in the Department as compared with court procedures, and said: "We express no views on those contentions, as each of them can appropriately be raised in the administrative proceedings, *and reserved for judicial review.*" [Emphasis added.]

termination at or prior to the approval of survey.

"The problem, then, as we understand it, is not what authority Congress may confer upon the Secretary, but what authority it has conferred in relation to the administration of this grant. If Congress has clothed the Secretary with general authority to administer the grant, and if his decisioin of fact in this instance was made within the scope of such authority, there can be no doubt that his decision is conclusive on the courts, in the absence, at any rate, of fraud or imposition. The holdings to this effect are too numerous for citation, but among those apposite are Catholic Bishop of Nesqually v. Gibbon, 158 U.S. 155, 15 S.Ct. 779, 39 L.Ed. 931; Cameron v. United States, 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659; St. Louis Smelting & Refining Co. v. Kemp, 104 U.S. 636, 26 L.Ed. 875; Wright v. Roseberry, 121 U.S. 488, 7 S.Ct. 985, 30 L.Ed. 1039; Burke v. Southern Pacific R. Co., 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527; Johnson v. Drew, 171 U.S. 93, 99, 18 S. Ct. 800, 43 L.Ed. 88."

Standard Oil Co. of California v. United States, 107 F.2d 402 at p. 410:

"Of course, in order to give conclusive effect to his decision, the Secretary's power in the premises must be exercised within the limits of due process, that is, after notice and hearing and upon evidence. Cameron v. United States, supra; Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598, supra; Shields v. Utah & Idaho R. Co., supra. Compare Iron Silver M. Co. v. Campbell, 135 U.S. 286, 10 S.Ct. 765, 34 L.Ed. 155. But there is here no question of due process. Appellants participated in the proceeding before the department and make no complaint that they were not accorded full opportunity to present their evidence."

4. Best v. Humboldt Mining Company, 371 U.S. 334, at p. 336, 83 S.Ct. 379, at p. 382:

"* * * the Department has been granted plenary authority over the administration of public lands, including mineral lands; and it has been given broad authority to issue regulations concerning them."

Best v. Humboldt Mining Company, 371 U.S. 334, at p. 337, 83 S.Ct. 379, at page 483:

"'Due process in such case implies notice and a hearing. But this does not require that the hearing must be in the courts, or forbid an inquiry and determination in the land department.' Orchard v. Alexander, 157 U.S. 372, 383, 15 S.Ct. 635, 39 L.Ed. 737. If a patent has not issued, controversies over the claims 'should be solved by appeal to the land department, and not to the courts.' Brown v. Hitchcock, 173 U.S. 473, 477, 19 S.Ct. 485, 487, 43 L.Ed. 772. And see Northern Pacific R. Co. v. McComas, 250 U.S. 387, 392, 39 S.Ct. 546, 548, 63 L.Ed. 1049."

■ It has long been established that a qualified entryman upon public lands of the United States, whether as a locator of a mining claim, as a homesteader, or as one asserting rights under others of the multifarious laws governing entries on public lands, who perfects his entry by compliance with the applicable Act of Congress, thereby acquires a right to the land as against the sovereign itself, as well as third persons. Wilbur v. United States ex rel. Krushnic, 1930, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445. It is such a legal right which Appellant here seeks to assert, and it is not a right which the Secretary of the Interior may, in his discretion, ignore or which he may reject "in the absence of fraud or imposition." This is precisely the kind of right which the Administrative Procedure Act, with its provisions for judicial review, was designed to safeguard from arbitrary, capricious and illegal deprivation by action of executive and administrative agencies. Adams v. Witmer (9 CCA 1959), 271 F.2d 29.

■ The Government also argues that we are here dealing with a "collateral attack" upon final agency action rather than a direct review thereof, and that the judicial surveillance of agency action is, therefore, under a more restrictive standard. The argument is made because after the Secretary's final decision on March 27, 1962, nothing was done by anyone until the United States filed this ejectment action on August 8, 1963. Appellant then sought review of the agency action by counterclaim. Adams v. United States (9 CCA 1963), 318 F.2d 861, involved a similar procedural situation and a dictum there [p. 867] suggested a possible distinction. Upon reflection, however, we cannot discern any reason for a difference respecting the scope and character of review of agency action which would depend upon who commenced the action. This should not be a race to the courthouse. There is no statutory time limit for an aggrieved person to seek judicial review of agency action in the Department of the Interior under 5 U.S.C. § 1009.[5] So far as the Government's present contention is concerned, had Coleman brought an action to review the Secretary's decision one day before the eviction suit was filed, this would have been a direct review rather than a so-called "collateral attack." It serves nothing to talk about collateral attack merely because review of agency action is sought in a counterclaim rather than in a complaint.

The issues, then, which faced the District Court are those provided in the Administrative Procedure Act. Were the "agency action, findings, and conclusions * * * arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence?" 5 U.S.C. § 1009(e) (B) (1) (5).

In one form or another, each of the decisions rendered within the Department in this case was based upon the issues raised by the second charge of the contest, (b), that a valid discovery had not been made.

In order to validate a mining claim under the mining laws of the United States, there must be a discovery of a valuable mineral deposit within the limits of the claim. 30 U.S.C. §§ 23, 25. The basic test used to determine whether such discovery has been made was stated by the Department in Castle v. Womble, 19 I.D. 455, 457 (1894), to be that:

"* * * where minerals have been found and the evidence is of such a character that a person of ordinary prudence would be justified in further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine, the re-

---

5. While the statute (5 U.S.C. § 1031 et seq.) which vests exclusive jurisdiction in the Courts of Appeals to review final orders of certain federal agencies limits the time for such petitions (§ 1034), we find nothing in the Administrative Procedure Act (5 U.S.C. § 1009) relating to review of agency action generally, nor in the Department of Interior rules and regulations, which prescribes a time limitation for district court actions to review final administrative determinations.

quirements of the statute have been met."

The standard has been judicially approved. Chrisman v. Miller, 197 U.S. 313, 25 S.Ct. 468, 49 L.Ed. 770; Cameron v. United States, 1920, 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659; Best v. Humboldt Mining Co., 1963, 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350.

■ All mining claims must meet this test to be valid. An additional element to the test of discovery, that of present marketability, has been imposed by the Department where the mineral in question is one of widespread occurrence. The reason for this additional element was made clear in Foster v. Seaton, 106 U.S.App.D.C. 253, 271 F.2d 836, 838 (1959):

> "With respect to widespread non-metallic minerals such as sand and gravel, however, the Department has stressed the additional requirement of present marketability in order to prevent the misappropriation of lands containing these materials by persons seeking to acquire such lands for purposes other than mining."

On July 23, 1955, Congress enacted what is now Section 611 of Title 30, United States Code. Section 611 provides, in part, that "No deposit of common varieties of sand, stone, gravel, pumice, pumicite, or cinders * * * shall be deemed a valuable mineral deposit within the meaning of the mining laws of the United States so as to give effective validity to any mining claim hereafter located under such mining laws * * *." The purpose of § 611 is clearly revealed in the following quotation from House Report 730, 84th Cong., 1st Sess., 1955, U.S. Congressional & Administrative News, p. 2478:

> "The Committees on Interior and Insular Affairs of both the House and Senate have in the past several years been made increasingly aware of the abuses under the general mining laws by those persons who locate mining claims on public lands for purposes other than that of legitimate mining activity."

Thus, by enacting § 611, Congress addressed itself to the very problem which the Foster v. Seaton test was designed to resolve. Although Foster v. Seaton was decided in 1959, it was a review of a Secretary's decision on a contest initiated before 1955 and applied an Interior Department decision made in 1933 in Layman v. Ellis, 54 I.D. 294.

The Department's use of Section 611 in this case, as reflected by the final agency decision, constitutes a misapplication and misconstruction of the statute. In the final decision, the Deputy Solicitor stated:

> " * * * Since the Congress withdrew common varieties of building stone, sand and gravel from location under the mining laws on July 23, 1955 (30 U.S.C., 1958 Ed., sec. 611), it was incumbent upon Coleman to show that all the requirements for discovery of a valuable mineral deposit, including a showing that these materials could have been extracted, removed, and marketed at a profit, had been met by that date * * *.

> "In view of the immense quantities of identical stone in the area outside the claims, the stone must be considered a 'common variety' within the meaning of the act.

> " * * * *

> "The only issue in dispute at the hearing on September 16, 1958, was the existence of a market for profitable sales before July 23, 1955. * * * I am unable to find evidence which supports such conclusion as to any of the claims."

■ We disagree and conclude that proof of discovery as of the time of the contest proceedings is all that is required in this case; that is, that contrary to the Department's assumption, the term "stone" in § 611 does not include "building stone" as that term is used in § 161

and that, therefore, § 611 does not apply at all.[6]

One of the methods adopted by Congress in 1955 to curtail abuses of the mining laws was the exclusion from previously locatable minerals of common varieties of sand, gravel, pumice, pumicite and cinders. Yet, recognizing that this statutory barrier to abuses of the mining laws was so broad as to cover non-abusive mining claims, the Congress narrowed the scope of the Act by defining "common varieties" in a limited way. As stated in House Report 730, supra: "The last sentence of this section declares that—

"'Common varieties' as used in this act does not include deposits of such materials which are valuable because the deposit has some property giving it distinct and special value * * *,

which language would exclude materials such as limestone, gypsum, etc., commercially valuable because of 'distinct and special' properties." As finally enacted, § 611 also excluded from its "common varieties" classification "so-called 'block pumice' which occurs in nature in pieces having one dimension of two inches or more."

 When § 611 was enacted, Congress was of necessity well aware of its earlier statute (Sec. 161) respecting building stone. Nowhere in the available legislative history of § 611 is there found any indication of a Congressional intent to repeal § 161. Certainly there was no express repeal, and repeals by implication are not favored. United States v. Zacks, 375 U.S. 59, 84 S.Ct. 178, 11 L.Ed. 2d 128 (1963); Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct.

---

6. The Department's interpretation of § 611 as including building stone is at least its second attempt in the history of the mining laws to exclude building stone from the coverage of those laws. The first attempt was thwarted by Congressional action, and we do not believe that the present one is sustainable. The earlier history of building stone as a locatable mineral was succinctly stated in House Report 1204, 52nd Congress, 1st Session, as follows:

"In the case of Rosse vs. Wainman, 14 M. & W., 859, (same case, 2 Exch., 200, and 15 L.J., 67), it was held (quoting syllabus):

"'The term "mineral" is more frequently applied to substances containing metals, but in its proper sense includes all fossil bodies or matters dug out of mines; in this sense beds of stone may be included in the word minerals.'

"So in the case of Micklethwait vs. Winter, 6 Exch., 644 (same case, 5 Eng. L. & E., 526); and Midland R. Co. vs. Checkley, Law R., 4 Eq., 24, it was held that stone taken from quarries is a mineral.

"The above has been the construction given the mining laws of the United States by the Interior Department since the act of 1872 was passed, until a very recent date, and even now all kinds of stone are held to be subject to mineral entry except building stone, the test applied being uniform with regard to all mineral substances, viz., whether or not the land containing such substance is more valuable therefor than for agricultural purposes.

In the case of Conlin vs. Kelly, decided in the Department January 2, 1891, and reported in 12 Land Decisions, 1, however, it was held that lands which contain deposits of building stone only are not subject to entry under the mining laws. This decision has brought dismay and threatened ruin and disaster to many citizens who in good faith, relying on the settled and long-continued procedure of the General Land Office, had invested large sums of money in the development of stone quarries upon the public lands, expecting to obtain patents under the mining laws. It changes what had become a recognized rule of property, and the committee think this is a matter which justly demands the action of Congress to fix the status of such lands without the possibility of doubt."

Accordingly, Congress enacted Section 161 "to fix the status" of building stone lands. Cf. Northern Pacific Ry. v. Soderberg (1903), 188 U.S. 526, 23 S.Ct. 365, 47 L.Ed. 575. Graceful acceptance of this Congessional mandate proved impossible for the Department in the long run. First the present marketability requirement as expressed in Foster v. Seaton was applied to the exclusion of the Castle v. Womble test of discovery, thereby imposing an onerous burden on the building stone miner. Then followed the attempt to use § 611 to eliminate building stone as a discoverable mineral, an interpretation of that section which we believe was not intended by the Congress.

1246, 10 L.Ed.2d 389, rehearing denied 375 U.S. 870, 84 S.Ct. 26, 11 L.Ed.2d 99 (1963). It is a settled rule of statutory construction that a general law is not held to repeal or supersede an earlier specific law in the absence of a definite expressed intention. Stewart v. United States (9 CCA 1939), 106 F.2d 405; Anderson v. Gladden, D.C.Or.1961, 188 F. Supp. 666, aff. 293 F.2d 463. Stone which is chiefly valuable as building stone is, by that very fact, not a common variety of stone. Thus § 611 does not bar location of mining claims for building stone under § 161. The Department's "quantity equals common variety" formula is not consistent with either the letter or the spirit of the 1955 statute, and represents a departure from the earlier and, we think, correct position of the Department as expressed by the Bureau of Land Management in two letters appended to Appellant's brief.[7] One letter, dated October 11, 1957, signed by Max Caplan "for the Director", states: "Stone, commercially valuable because of distinct and special properties, such as * * * stone suitable for cutting into blocks or naturally cleavable into slabs for building purposes, * * * would not be considered common varieties."

The other letter, dated February 9, 1959, signed by W. L. Shafer "for the Director" contains virtually identical language. Whether or not these letters represent an official position of the Department need not concern us as we decide, as a matter of law, that the existence of § 161 precludes application of § 611 to building stone.

The Interior Department decisions and regulations and Court rulings over the years have been interpretations of the General Mining Law of 1872 (17 Stat. 91), which, with respect to the validity of mining locations and applications for patents of mining claims, has remained virtually unchanged since enactment. The problem here presented concerns the interpretation of "valuable mineral deposit" (30 U.S.C. § 22) and "valuable deposits" (30 U.S.C. § 29) as used by the Congress. See: Adams v. United States (9 CCA 1963), 318 F.2d 861, 870. Since Castle v. Womble, supra, the basic, judicially approved, standard of discovery of a valuable mineral requires proof that a person of ordinary prudence would be justified in further expenditure of his labor and means, with reasonable prospect of success, in developing a paying mine. "But value, in the sense of proved ability to mine the deposit at a profit need not be shown." Adams v. United States, supra. This is clearly the standard applied to metallic minerals and minerals of limited occurrence. There is nothing in the mining laws which justifies a different standard for non-metallic minerals or minerals of widespread occurrence insofar as proof of a "valuable" mineral discovery is involved. In fact, with respect to building stone, the Congress has expressly stated: "Any person authorized to enter lands *under the mining laws* of the United States may enter lands that are chiefly valuable for building stone *under the provisions of law in relation to* placer-mineral claims." 30 U.S.C. § 161. (Emphasis added.) Thus it was implied that building stone claims must meet the same standards, and no greater standards, than those for the discovery of other valuable minerals. Cf. Mulkern v. Hammitt, (9 CCA 1964), 326 F.2d 896, sand and gypsum claims.

What, then, is the import of Foster v. Seaton, 106 U.S.App.D.C. 253, 271 F.2d 836 (1959), and the Interior Department decisions which it followed? On casual reading, it appears to add additional, administratively imposed, non-statutory requirements for the discovery of "valuable" minerals of widespread occurrence. These are: "Accessibility, bona fides in development, proximity to market, existence of present demand and other factors (to show that) the deposit is of such value that it can be mined, removed and disposed of at a profit." As interpreted

---

7. These letters are not part of the evidentiary record before this Court. However, as an aid to our decision of a matter of law, we believe it proper to notice them.

by the Department of the Interior in the present case, as well as others, these are tests of the discovery of a "valuable" mineral deposit and have resulted in an absolute requirement that the locator prove a present profit, in derogation of the rule of Castle v. Womble. We suggest that this is an incorrect interpretation of the *Foster* case for the following reasons: (1) There is nothing in the general mining law authorizing location of valuable minerals which justifies, or even suggests, a distinction between minerals of widespread occurrence and minerals of more limited occurrence; thus, the interpretation is not based upon the voice of Congress but is legislative in character; (2) the purpose of the requirements is "to prevent the misappropriation of lands containing these materials by persons seeking to acquire such lands *for purposes other than mining*" (Foster v. Seaton, 106 U.S.App.D.C. 253, 271 F.2d at 838), an objective which is substantially unrelated to the factual determination of discovery of a "valuable" mineral under the Castle v. Womble criteria; (3) the Interior Department decisions after the leading case, Layman v. Ellis, 52 I.D. 714, 54 I.D. 294, represent misapplications and unwarranted extensions of the expressed rationale and basis of that decision; and (4) at least one of the requirements stated, "bona fides of development", has nothing at all to do with proof of present marketability at a profit.

We think that Foster v. Seaton, on proper analysis, is *judicial recognition* of the requirement of the good faith of the applicant for a mineral patent, a requirement which finds a foundation in the Act of Congress, for 30 U.S.C. § 29 provides: "A patent for any land claimed and located for valuable deposits may be obtained in the following manner: Any person * * * having claimed and located a piece of land *for such purposes* * * * may file [etc]." This is an explicit statement that the purpose and motive of the applicant are proper subjects of inquiry and that if the claims were located in bad faith and not for the purpose of mining valuable mineral deposits, the application for patent may be rejected.[8]

The confusion which has been caused by the Department's efforts to distinguish between non-metallic and metallic minerals and between minerals of limited and of widespread occurrence in defining standards for a discovery of valuable mineral under the mining laws, distinctions which have no basis in the statutes, is demonstrated in the mining texts, American Law of Mining, Vol. I, § 4.26, pp. 646–647:

"While the Land Department decisions do present some rather extreme examples of stringency and harshness in applying the prudent man test to mining claims, this should not be taken to indicate that the same rigid standards will be applied in all cases, especially where there have been no with-

---

8. This *implication* from the mining laws is recognized in the Departmental regulations:

43 C.F.R. 3413.1: "No lode claim shall be located until after the discovery of a vein or lode within the limits of the claim, the object of which provision is evidently *to prevent the appropriation of presumed mineral ground for speculative purposes, to the exclusion of bona fide prospectors*, before sufficient work has been done to determine whether a vein or lode really exists."

43 C.F.R. 3452.1 (pertaining to proving title under 30 U.S.C. § 38): "When an applicant desires to make his proof of possessory right in accordance with this provision of law he * * * will be required to furnish * * * any additional facts within the claimant's knowledge having a direct bearing upon his possession and bona fides * * *."

43 C.F.R. 3470.3: "In placer applications, in addition to the recitals necessary in and to both vein or lode or placer applications, the placer application should contain, in detail, such data as will support the claim that the land applied for is placer ground containing valuable mineral deposits *not in vein or lode formation and* that title is sought not to control water courses or to obtain valuable timber but *in good faith because of the mineral therein.*" (Emphasis added.)

drawals; no one has protested the issuance of patent; a contest has not been instigated by the Forest Service or other agency; and the claims are in fact located in good faith for the purpose of acquiring the land because of its mineral deposits. The Land Department has not looked favorably upon attempts to acquire public domain land having values for subdivision, recreational, timber or other uses by the device of locating mining claims for minerals which are sometimes of dubious value. If not convinced of the good faith of the mining claimant in such situations, it seems probable that the mineral examiners, hearing officers and other officers and agents of the Land Department will take a very strict view of mining locations in such areas and that the prudent man test will be applied very strictly, verging on a commercial value requirement, even where the minerals in question have intrinsic value.

"This is not to say that mining claims cannot be legitimately made and the discoveries thereon supported where the land is valuable for reasons other than its mineral content, but the burden of sustaining such claims is greatly increased in such cases."

The leading Interior Department decision from which stems the present departmental requirement of proof of present marketability at a profit for patentability of locations claiming minerals of widespread occurrence is Layman v. Ellis, (1929), 52 I.D. 714, aff'd 54 I.D. 294. The first decision, holding sand and gravel to be locatable minerals, does not discuss the requirements for proof of discovery of valuable minerals, but cites Lindley on Mines, § 98:

"The mineral character of the land is established when it is shown to have upon or within it such a substance as—

"(a) Is recognized as mineral, according to its chemical composition, by the standard authorities on the subject; or—

"(b) Is classified as a mineral product in trade or commerce; or—

"(c) Such a substance (other than the mere surface which may be used for agricultural purposes) as possesses economic value for use in trade, manufacture, the sciences, or in the mechanical or ornamental arts;—

"And it is demonstrated that such substance exists therein or thereon in such quantities as render the land more valuable for the purpose of removing and marketing the substance than for any other purpose, and the removing and marketing of which will yield a profit; or it is established that such substance exists in the lands in such quantities as would justify a prudent man in expending labor and capital in the effort to obtain it."

The decision concludes that "valuable gravel deposits fall within categories (b) and (c) of Mr. Lindley." It is noted that Lindley suggested proof of present marketability at a profit as an alternative to the Castle v. Womble test. When Acting Solicitor (now Judge) Fahy reviewed and affirmed the decision (1933, 54 I.D. 294), he explained:

"The main objection that appeared to the application of this principle to such commonplace substances as sand and gravel, was that it would render facile the acquirement of title to numerous areas containing sand and gravel for other purposes than mining, but this objection may be urged with as much reason against other mineral substances of wide occurrence and extent which under the same limitations and qualifications are locatable and enterable under the mining law, such as, for example, limestone, marble, gypsum, and building stone. Furthermore, the objection mentioned is not of much force when it is considered that the mineral locator or applicant, to justify his possession, must show that by reason of accessibility, bona fides in development, proximity to market, existence of present demand, and other factors, the deposit is of such value that it can be mined, removed and disposed of at a profit. Cases have been frequent where the

Department has refused patent to lands containing the mineral substances last mentioned in abundance, where the evidence as to the value of the deposit was insufficient or lacking. No reason is seen, therefore, to overrule the case of Layman et al. v. Ellis. It follows that sand and gravel which can be extracted, removed, and marketed at a profit, obtained from land that has been duly and properly located under the mining law as a placer claim, may be lawfully disposed of for use, not only on Federal aid highways, but for other purposes."

This is the genesis of the Department's absolute requirement of proof of present marketability at a profit to sustain a location of minerals of widespread occurrence. Estate of Victor E. Hanny, 63 I.D. 369 (1956); United States v. Everett Foster et al., 65 I.D. 1 (1958), aff'd Foster v. Seaton, 106 U.S. App.D.C. 253, 271 F.2d 836 (1959); United States v. Strauss, 59 I.D. 129 (1945); United States v. George W. Black, 64 I.D. 93 (1957); United States v. Barngrover, 57 I.D. 533 (1942); United States v. Fife, A–28386 (Sept. 19, 1960); United States v. Philip Jungert, A–28199 (April 14, 1960); United States v. Jacobo Armenta, A–28248 (June 22, 1960). We think the foundation does not support the structure. The *Ellis* cases, as was articulated in Foster v. Seaton, deal with the purpose of the location, in essence, the bona fides of the claimant, and seek to preclude the seizure of public lands for purposes other than mining under the mining laws. We perceive no reason for a distinction between a placer claim allegedly for gold bearing sand and a placer claim for building stone with respect to the requirements for proof of presence of a valuable mineral. The prudent man test of Castle v. Womble should suffice for either. Cf. Mulkern v. Hammitt, supra, sand and gypsum; Adams v. United States, supra, sand and gold; Henrikson v. Udall (9 CCA 1965), 350 F.2d 949, 229 F.Supp. 510, sand and gravel. In addition, the applicant may be required to show, if challenged to do so, that the claims were located in good faith for the minerals therein, and not for other unrelated purposes.

This, of course, is not to suggest that the Foster v. Seaton guidelines of accessibility, bona fides in development, proximity to market and existence of a present demand and other factors are irrelevant as evidence bearing upon the ultimate issues of good faith and existence of a valuable mineral deposit. But these ultimate issues should be resolved in each case from the evidence as a whole and it is improper, in our view, to convert one aspect of relevant evidence into an absolute legal requirement with respect to a certain class of minerals in derogation of a time-honored, judicially approved test of "value" applicable to all locatable minerals.

Inasmuch as this case should be remanded to the Department for reconsideration under correct legal standards, there are other matters which deserve brief comment. In his final decision, the Deputy Solicitor remarked that the Appellant did not make the required showing of marketability as to all claims. He said: "Whether expenditures for improvements on other claims may or may not be credited to these (disallowed) claims is immaterial because it is abundantly clear that there was no marketing of any products from these claims." The Castle v. Womble prudent man test does not require such a showing, although such evidence is, of course, relevant proof under the issue as to each separate mining claim. The Castle v. Womble test implies a forecast of the reasonably anticipable future. Further, the Department placed great weight upon Coleman's testimony that he had devoted over four thousand hours working on the claims for eight or nine years, which, computed at $3.50 per hour, meant an expenditure of $157,500 in labor, and concluded that Coleman could not conceivably have made a profit. We have found no case authority on the subject of whether the calculated value of a locator's labor in developing the property should be charged as an

expense in determining profitability.[9] This may be because the question has not arisen under the Castle v. Womble test of reasonable expectation of profit, while the Departmental requirement of proof of present profit for location of non-metallic minerals of widespread occurrence is of fairly recent origin. In any event, the history of prospecting and mining in the Western United States records the essence of individualism in economic activity and the Mining Law of 1872 was enacted as a Congressional codification of the procedures and practices of miners. Academic economics has little meaning for a miner and his "profit" is made if his receipts exceed his out-of-pocket expenditures, although he may be grossly underpaid for his labor.

 Coleman represented himself in the evidentiary hearing before the Hearings Examiner in 1958 and throughout the administrative appeals. He was quite evidently bewildered by the Government's assertion that the claims were not mineral in character and that there had been no discovery of valuable minerals, relying with assurance, and some justification we have found, on 30 U.S.C. § 161. Although he was properly guided by the Hearing Examiner, to a degree, his lack of awareness of the issues upon which the case was ultimately determined by the Secretary is evident. We think that if the Department of Interior intends to put in issue Coleman's good faith as an applicant for patent, it should

so state in the contest complaint. Under the circumstances, the whole proceeding should be remanded to the Department.

In summary, we hold:

1. The decision of the Secretary of Interior invalidating Coleman's building stone claims was properly before the District Court for review under the counterclaim.

2. The standards of review are those elucidated in the Administrative Procedure Act (5 U.S.C. § 1009).

3. Congress, by enacting 30 U.S.C. § 611, did not repeal 30 U.S.C. § 161 concerning building stone, and proof of discovery of a valuable mineral is to be determined as of the date of the contest hearing and not as of July 23, 1955.

4. The applicable criteria of presence of a valuable mineral in each of the claims is whether a person of ordinary prudence would be justified in further expenditure of his labor and means with a reasonable prospect of success in developing a valuable mine.

5. If the good faith of the applicant in locating the ground for the asserted purpose of exploiting the minerals therein is an issue, the applicant for patent should be put on notice of the issue in the contest complaint.

6. The decision of the Secretary of the Interior invalidating Coleman's mining claims is not in accordance with law and, under the circumstances related,

---

9. The Director of the Bureau of Land Management, in his decision in this case, minimized the weight of this testimony, saying:

"The record shows that stone has been removed and marketed from those claims ever since their location in 1949. Income from past sales has just about equalled the cost and value of improvements without allowance for any recompense to Mr. Coleman for his own labor. Be that as it may, it is good accounting procedure to amortize the cost of permanent improvements over a long period of time; current and/or future expenditures for maintenance will be far less than the initial costs. Under such circumstances, continued sales, even at the rate shown

for the first ten years of operations have and will result in a livelihood to Mr. Coleman; he will realize a profit from operations over and above the value of his own labor. It matters not that the stone operations may not sustain a mammoth operation by a large company; it is sufficient that a prudent man be justified in expending labor and means with a reasonable prospect of success in developing a paying mine. Since a continuing and steady market, albeit not expanding, is shown to exist, and marketability of the product at a profit (even though not a great one) is shown, discovery within the meaning of the mining laws, all else being regular, is established."

**204**

is arbitrary, capricious and an abuse of discretion, and should be set aside.

Accordingly, this case is remanded to the District Court with instructions to enter judgment denying plaintiff's prayer for ejectment and, on the counterclaim, reversing the final decision of the Secretary of the Interior and remanding the case to the Department of the Interior for further proceedings and decision in accordance with the principles herein enunciated.